UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL W. LYNCH,

      Plaintiff,                         Hon. Ellen S. Carmody

v.                                   Case No. 1:07-cv-00308

FORT DEARBORN LIFE INSURANCE
COMPANY,

      Defendant.

_____/


**OPINION**

      This matter is before the Court on Plaintiff's Motion for Summary Judgment.  (Dkt. #27). The Court notes that the Sixth Circuit in *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609 (6th Cir. 1998) has held that summary judgment procedures are not appropriate in the adjudication of ERISA actions to recover benefits.  *Id.* at 619.  In keeping with *Wilkins*, the Court will evaluate the instant motion not as a motion for summary judgment but rather as a motion for entry of judgment seeking a reversal of the plan administrator's decision to deny Plaintiff long-term disability benefits.  In its response (Dkt. #28) to Plaintiff's motion, defendant requests judgment on behalf of defendant.  The parties were heard on November 7, 2007.  For the reasons stated below, Plaintiff's motion is denied and judgment will be entered for Defendant.

      As part of his previous employment as a stagehand, Plaintiff was provided long-term disability insurance through Defendant, Fort Dearborn Life Insurance Company.  The policy in question provided two-tiered disability coverage.  Plaintiff was entitled to disability payments for

the first twenty-four (24) months if he was unable to perform his work as a stagehand.  However, after this initial period of benefits Plaintiff was entitled to disability payments only if he was unable to perform "any other occupation."  The specific policy language is as follows:

> TOTAL DISABILITY or TOTALLY DISABLED means that during the elimination period and the next 24 months of disability you are:
>
> 1.   unable to perform all of the material and substantial duties of your occupation on a full-time basis because of a disability:
>
>      a.   caused by injury or sickness;
>      b.   that started while you are insured under this coverage; and
>
> 2.   after 24 months of benefits have been paid, you are unable to perform with reasonable continuity all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity.

A June 2002 accident rendered Plaintiff unable to perform his duties as a stagehand, an issue neither party has ever disputed.  Accordingly, Plaintiff was paid disability benefits under subsection (1) of the policy language quoted above.  In September 2005, however, Defendant concluded that Plaintiff was no longer entitled to disability benefits because while he was unable to perform his previous work as a stagehand he was capable of performing some other occupation.  Plaintiff brings the present action asserting that Defendant's determination in this regard was arbitrary and capricious.

<u>STANDARD OF REVIEW</u>

The parties agree that the standard applicable to Plaintiff's claim is the "arbitrary and capricious" standard of review, and the Court concurs.  As is well recognized, the arbitrary and capricious standard "is the least demanding form of judicial review of administrative action." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).  Accordingly, if

Defendant can "offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id. See also, Evans v. UnumProvident Corp.*, 434 F.3d 866 (6th Cir. 2006).   The mere possibility that an alternative conclusion could be reached by the court or others does not provide a basis for reversing a claim decision that is premised upon a rational evaluation of the evidence. *Cochran v. Trans-General Life Ins. Co.*, 60 F.Supp.2d 693 (E.D.Mich.1999).

<u>INVESTIGATIVE HISTORY</u>

In June of 2004, after Fort Dearborn had taken responsibility for the first two years of benefits, Kristin Fielding, R.N., conducted a review of the medical records submitted by Plaintiff in support of his claim.  (Tr. 488-92)[1].  Fielding concluded that the medical records did not support Plaintiff's cervical and lumbar radicular complaints and that the examination findings submitted suggested inconsistent diagnoses.  (Tr. 492).  Fielding concluded that additional information was needed to evaluate Plaintiff's level of impairment and any corresponding work restrictions.

In June 2005, Plaintiff's treating physician, Dr. Naylor, reported that Plaintiff suffered from extremely severe functional limitations.  (Tr. 85, 131-33).  A medical consultant employed by Defendant concluded that the objective medical record did not support the degree of limitations articulated by Dr. Naylor.  Accordingly, Defendant (while still continuing to pay Plaintiff disability benefits) began to more closely investigate Plaintiff's condition.  Defendant's investigation was quite thorough and deliberate.

---

[1] The Court will cite to the Administrative Record as Tr. ___.

On June 13, 2005, Donna Chamoff, R.N., Defendant's medical consultant, reviewed Plaintiff's medical records to ascertain whether the restrictions imposed by Dr. Naylor were supported. (Tr. 123-26). Chamoff concluded that there was not sufficient objective data to support Plaintiff's claim of total functional impairment due to chronic back and neck pain. (Tr. 126).

As a result of Chamoff's review, Defendant conducted surveillance of Plaintiff's daily activities from July 7-10, 2005. (Tr. 1930-31). After reviewing additional information including the surveillance video, Chamoff concluded that the objective medical records and other data did not support Plaintiff's claimed level of functional impairment. (Tr. 1272). Chamoff offered to provide Dr. Naylor, Plaintiff's treating physician, with a copy of the surveillance video and to discuss the new information to see if this had any impact on Dr. Naylor's opinions. Ultimately Dr. Naylor's staff advised that Dr. Naylor was declining the invitation to discuss the new data and advised that Dr. Naylor did not intend to submit any additional information. (Tr. 1242).

As noted, Defendant employed an investigator who performed surveillance on Plaintiff for three days in July 2005. The investigator's report is included in the administrative record. (Tr. 19-31). Defendant has also submitted (as part of the administrative record) a DVD recording of the investigator's observations of Plaintiff. While the DVD is approximately 20 minutes in length, it is comprised of what appear to be identical two 10 minute segments. Nonetheless, as this video reveals (and as the investigator details in his report) the investigator observed Plaintiff engaging in a wide variety of activities which are contrary to the limitations articulated by Dr. Naylor, and appears to demonstrate that Plaintiff is capable of performing an occupation. In fact,

this video demonstrates that Plaintiff was engaged in an occupation, that is, participating in management of a brewery and small restaurant he had purchased.[2]

Much of the video surveillance occurred at the Boyne River Brewing Company. While Plaintiff initially denied any active involvement with the brewery, Defendant's investigation revealed that Plaintiff was, in fact, the owner of the Boyne River Brewing Company. (Tr. 285-87). Plaintiff now acknowledges that he was the President of the Brewery. (Dkt. #27 at 3). While, as noted, perhaps somewhat exaggerated by Defendant, the activities observed on the surveillance video support Defendant's position that Plaintiff was, in fact, performing some work activities in his capacity as owner/operator of the Boyne River Brewing Company. It also supports Defendant's contention that Plaintiff was not disabled to the degree stated by Dr. Naylor.

Defendant continued to investigate Plaintiff's condition while paying him benefits. Ruby MacDonald, C.R.C., C.D.M.S., C.C.M., a vocational consultant, provided additional review and assessment. (Tr. 1230-35). On September 13, 2005, the vocational consultant concluded that Plaintiff would be able to return to the labor market in a gainful capacity. (Tr. 1235).

Defendant advised Plaintiff of its decision that he did not qualify for total disability benefits and the rationale for its conclusion on September 22, 2005. (Tr. 1210-14). Plaintiff was also invited to provide any additional information he believed to be relevant to this decision.

Defendant then gave the new information from Plaintiff, along with Plaintiff's voluminous records to date, to Dr. Thomas Reeder, a physician board certified in internal

---

[2] While the Court does not interpret the surveillance as expansively as Defendant, it clearly reflects on Plaintiff's credibility. Because many of Plaintiff's difficulties are self-reported with minimum objective findings, doubts about Plaintiff's credibility seem highly relevant to Defendant's determination.

medicine, for analysis.  (Tr. 1039-46).  Dr. Reeder concluded, in a written report dated November 18, 2005, that the medical records and other data did not support Plaintiff's claimed disability. He noted Plaintiff reported work activity in Dr. Naylor's records as well as in Dr. Greebe's records.  (Tr. 1042-43).  Dr. Reeder also concluded that objective diagnostic testing revealed findings inconsistent with Plaintiff's reported symptoms and claimed impairments.

Significantly, Dr. Reeder emphasized that Plaintiff's long-term prognosis related to his degenerative disc disease was no different that any other individual his age.  (Tr. 1046).  In response to follow-up questions from Defendant, (Tr. 1035-37), Dr. Reeder clarified that there was multi-level degenerative disc disease but that there was no objective evidence to support any spinal cord compression or nerve root compression.  (Tr. 1035).  It was Dr. Reeder's opinion that this would restrict Plaintiff only from heavy lifting and extremes of cervical and lumbar motion. Furthermore, Dr. Reeder noted that Plaintiff had no systemic disease that would cause the fatigue of which Plaintiff had complained.  (Tr. 1036).

Dr. Reeder also contacted Plaintiff's treating physician, Dr. Naylor, by telephone and sent her a letter summarizing their conversation.  (Tr. 1030-31).  There is dispute as to whether or not Dr. Naylor agreed with Defendant's conclusions that Plaintiff could perform light work.  She returned the correspondence and noted that she neither agreed nor disagreed.  (Tr. 1030-31). However, after she was sent the surveillance tape Dr. Naylor had no further comments to make in support of her earlier extensive restrictions on Plaintiff's work abilities.  (Tr. 1004).

Plaintiff objected that Defendant had not considered his post-concussive syndrome.  (Tr. 1097).  Defendant then requested updated medical records from Dr. Huder, an neurologist to whom Plaintiff had been referred by Dr. Naylor.  Defendant's consultant, Dr. Reeder, reviewed

Dr. Huder's records and concluded that the detailed neurological examination was normal except for a wide-based gait, dysphoric mood and chronic pain behaviors. (Tr. 1004). Dr. Reeder also noted that a brain MRI, MRA of the neck, and 24-hour ambulatory EEG were all normal. (Tr. 1004).

Defendant, without terminating Plaintiff's benefits, then conducted a new independent medical examination ("IME") and functional capacity evaluation ("FCE") before making a final decision on Plaintiff's appeal. (Tr. 1070). Dr. G. David Cavender, a board certified physiatrist, conducted the IME on April 4, 2006. (Tr. 866-88). The doctor first observed inconsistencies in Plaintiff's behavior:

> Prior to a formally evaluating the patient he is observed sitting comfortably in the examination room with his right leg in extension and stretched out to the side he talked with some of the people around him and was in no apparent discomfort and when I came to get him for the examination he immediately manifested multiple pain behaviors including grimacing and appeared to have great difficulty changing from a sitting to a standing position. While not being directly observed he ambulated slowly but without any apparent gait abnormality using a straight cane in his right hand.

(Tr. 866).

During the examination Plaintiff claimed that his right lower extremity was "constantly numb" and that his lower back pain ranges from "about a 6" on average to "at least a 10." (Tr. 867). The results of the examination were unremarkable, however, as the only abnormality observed was "restrictions of lumbar movement which were inconsistent." (Tr. 867-68). Dr. Cavender observed that Plaintiff had engaged in "inconsistent effort" during his examination. (Tr. 868). The doctor concluded that "there is no objective reason to medically restrict him in anyway at least in respect to his neck and low back. *Id.*

Plaintiff also participated in a functional capacities evaluation conducted by an industrial rehabilitation coordinator, Cheryl Walen, O.T.R., M.B.A., in April 2006. (Tr. 869-74). During this examination, Plaintiff reported that his is "unable to perform daily tasks outside of basic bathing and dressing activities" and "has fallen in the past due to inability to feel right leg." (Tr. 871). The examiner observed that Plaintiff "is currently demonstrating inconsistent and self limiting behaviors" which prevented an evaluation of his ability to perform full time work activities. (Tr. 869).

In light of the functional capacities evaluation report, the IME report, Dr. Reeder's reports and other information contained in Plaintiff's administrative record, Defendant notified Plaintiff of its decision, by letter dated May 17, 2006, that Plaintiff was not disabled to the extent required by the policy. (Tr. 834-38). Plaintiff requested a second appeal on October 12, 2006. (Tr. 813). Plaintiff was relying on a decision from the Social Security Administration awarding Plaintiff benefits. (Tr. 814-28).

Plaintiff's file was forwarded for a new appeal analysis. (Tr. 795). Defendant had Dr. Alan Neuren, board certified in psychology and neurology, review the record with particular attention to Plaintiff's claims of a cognitive or psychiatric impairment. (Tr. 784-87). Dr. Neuren concluded that the records relied upon by Plaintiff did not support his claim. He emphasized that there was no reported history of head injury at the time of his auto accident in the prior medical records. He noted that Plaintiff was in the hospital for only a few hours after the hit and run accident in May 2002. Furthermore, Plaintiff had not reported any treatment after the accident until approximately five weeks later when he treated with a chiropractor. (Tr. 786-87). In sum, the neurologist concluded that although there was now a claim of the occurrence of a head injury

and ensuing cognitive impairment, nothing in the contemporaneous medical records, or in the diagnostic test results, supported such a claim.  On December 15, 2006, Defendant notified Plaintiff of its decision to deny further benefits and its corresponding reasoning.  (Tr. 781-83). Plaintiff filed this lawsuit against Defendant on March 26, 2007.

<u>SUMMARY</u>

In support of his position that Defendant's decision was arbitrary and capricious, Plaintiff highlights the fact that he has been found disabled by the Social Security Administration.  As Defendant correctly observes, however, "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Whitaker v. Hartford Life and Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005).  The court recognized "the incongruity of binding an ERISA plan administrator to the SSA's disability determination, when the SSA - but not the ERISA administrator – is bound by law to accord special deference to a claimant's treating physician." *Id.*

Moreover, as Defendant asserts in its pleading, the Social Security Administration did not have the benefit when making its disability determination of much of the medical or surveillance evidence that Defendant relied upon in making its disability determination.  Plaintiff also relies on a selective portion of the medical record to support his position.

Defendant has made a thorough review of Plaintiff's medical records.  It has submitted Plaintiff's records for review to several professionals from different disciplines.  It has also conducted an IME.  Defendant also engaged, through its agents,  in discussion with Plaintiff's treating physician, Dr. Naylor, and invited her additional comment which apparently she declined.

9

In sum, a person could perhaps reasonably conclude that Plaintiff suffers from a certain amount of disability.  Defendant has never disputed this.  Defendant maintains that Plaintiff does not meet the requirement that he be unable to perform "any other occupation."  Defendant's decision to deny Plaintiff's claim was made after a thorough and reasonable evaluation of the medical and other evidence.  Defendant's determination represents a "reasoned explanation, based on the evidence," and, therefore, is not arbitrary or capricious.

<u>CONCLUSION</u>

For these reasons, Defendant's motion to uphold its decision is granted and Plaintiff's request to find Defendant's denial of benefits arbitrary and capricious (Dkt. #27) is denied. Judgment will be entered for Defendant.


Date:  March 27, 2008                           /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge

10